**CARLEY CAPITAL GROUP, et al., Plaintiffs,**

v.

**CITY OF NEWPORT NEWS, et al., Defendants.**

Civ. A. No. 88–15–NN.

United States District Court,
E.D. Virginia,
Newport News Division.

March 23, 1989.

Joseph B. Tompkins, Jr., Sidley & Yancey, Washington, D.C., for plaintiffs.

Warwick R. Furr, II, Shaw, Pittman, Potts & Trowbridge, McLean, Va., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILTON, District Judge.

### FINDINGS OF FACT

1. This is a suit for breach of an express written development agreement between plaintiffs, Carley Capital Group ("Carley"), and defendants, City of Newport News ("City") and the Newport News Redevelopment and Housing Authority ("Housing Authority").

2. The plaintiffs are Carley Capital Group, a real estate development partnership, David and James Carley, the owners of Carley Capital Group, and various limited partnerships, formed in connection with the projects at issue in this suit. All of the partners in the partnerships are citizens of states other than Virginia, and the amount in controversy exceeds the sum of $10,000.00, exclusive of interest and costs.

3. On November 2, 1982, pursuant to the provisions of Title 36 of the Virginia Code, the City adopted a plan to renovate and revitalize downtown Newport News, known as the Newport Centre Redevelopment Plan. In mid–1982, David Carley contacted Newport News City Manager, Robert T. Williams, and expressed interest in becoming the developer of some of the development projects described in Phase I of the Newport Centre Program. After various discussions and a presentation to the city council, the City approved, by resolution on December 20, 1982, a Development Option Agreement with Carley, for three of the Phase I projects. Specifically, the Development Option Agreement gave Carley the exclusive right and option, for a period of three months, to study the economic feasibility of three projects and to present an agreement for the development of those projects: a seventeen-story office building known as Washington Tower West; a twenty-five story hotel with associated retail, commercial and meeting room space; and a Courthouse Office Building.

4. During the option period, although not contemplated by the terms of the December 20, 1982 Development Option Agreement or by Phase I of the Newport Centre Program, Carley and City representatives discussed the possibility of including a high-rise residential apartment tower in the list of projects to be undertaken by Carley. On February 23, 1983, Carley reported to City Manager Williams that "a preliminary review of the housing market indicates a feasible (120–150 unit apartment building) project" and requested an option to study the inclusion of the Park Tower Apartment building in the plan. The apartment tower was added to the list of projects Carley was to evaluate. Subse-

quently, in a letter to city council, dated March 18, 1983, and at a city council meeting, held March 28, 1983, Carley reported to the city council that there was a "strong demand" for residential highrise development in downtown Newport News and that "an apartment building will enhance and complement the office building and retail space" under study pursuant to the December 20, 1982 Development Option Agreement.

5. After several extensions of the Development Option Agreement, Carley representatives met with the city council on June 27, 1983, and reported that the projects they had been studying were "viable". They stated that Carley was "prepared to take the risk to move forward with Phase I" and the projects set forth in the Option Agreement, as amended, including the Park Tower project which was now supported by a Carley-financed study.

6. The Carley representative at the June 27, 1983 meeting, Terry Lierman, stated that Carley was prepared to move forward with the Park Tower project (later called RiverPark Tower), and to finance it with $3 million in Carley equity, an Urban Development Action Grant ("UDAG") and $8.5 million in permanent financing.

7. As a result of the June 27, 1983 meeting, the City and Carley entered into a "Development Agreement", dated July 12, 1983 (the "1983 Agreement"). The 1983 Agreement provided, *inter alia,* for the development of the RiverPark Tower project according to the terms that Carley suggested.

8. Then, in July 1984, the City and Carley entered into an "Amended and Restated Development Agreement" (the "1984 Agreement"). The 1984 Agreement expressly superseded the 1983 Agreement, except that the provisions of the 1983 Agreement relating to RiverPark Tower were incorporated by reference.

9. In contrast to the 1983 Agreement, which had provided that all of the projects were interdependent, the 1984 Agreement contained a severability clause. Additionally, the 1984 Agreement provided for pre-

liminary agreement on the Courthouse Office Building to be followed by final agreement on lease terms. The Agreement continued, however, in Section 5, to provide that if the parties were unable to reach final, mutually agreeable lease terms for the courthouse, Carley would "relinquish" its right to develop the project and the parties would have no further liability, one to the other.

10. Other than these provisions, the essential elements of the 1984 Agreement were that the City was to acquire, and that Carley was to purchase, upon "mutually agreeable terms and conditions", the sites for the Greek Church restaurant, the townhouse complex, the Washington Tower West Building, the Courthouse Office Building, the hotel and commercial facilities, and a new project, the Festival Marketplace. Carley then was to "oversee, manage, and coordinate the design, development, construction, equipment, and operation of each of these facilities, substantially in conformance with (i) the plan, (ii) all applicable building codes and regulations and (iii) the prevailing market conditions."

11. The RiverPark Tower project was designed by the architectural firm of Odell Associates of Charlotte, North Carolina, and built by Metric Constructors, Inc., also of Charlotte. In late 1984, construction estimates came in over budget, and a process of "value engineering" was undertaken by Carley, Metric, and Odell to reduce costs. One result of this value engineering was a revision in the exterior cladding of the building from brick to a porous concrete block. This design change, without necessary attention to through-wall flashing details, resulted in a design with serious potential through-wall water infiltration.

12. The construction of the project began in the fall of 1984, but was delayed beyond the scheduled June 1, 1986 completion date. Metric completed sufficient construction by October 1, 1986, to obtain a certificate of occupancy for the first eight floors. An occupancy permit was obtained for the remaining floors on October 29, 1986.

13. Before the building was occupied, a water infiltration problem caused by the design and construction errors became apparent. This problem prevented the leasing of certain apartment units through late 1987, when repairs to the building to correct the infiltration problem were completed.

14. Marketing efforts for the RiverPark Tower project were affected by the delays. In order to rent the building, Carley reduced rents in August 1986, before the building was opened, and twice more in late 1986. But, since August 1987, Carley has raised rents twice, for an increase of more than 15 percent. Carley still, however, has not leased any of the commercial space on the first floor of the Tower.

15. As a result of these problems: overly optimistic rental projections, defective design, and the construction delays, building revenues for RiverPark Tower were substantially less than those anticipated in Carley's original projections.

16. As a result of these cash shortfalls, Carley and its banks agreed that the final construction work would be financed out of a Debt Service Reserve Fund, which had been created by the bond documents. In late 1986, the banks accordingly drew upon the Debt Service Reserve Fund and required the City and the Housing Authority to contribute $750,000 in cash to the project. In connection with this arrangement, Carley signed a note with the Housing Authority, which required Carley to pay interest on the $750,000 loan on a quarterly basis.

17. The 1984 Agreement required the City, or the Housing Authority, to acquire the old Greek Church located on West Avenue, next to the RiverPark Tower project, and required Carley to purchase it from the City upon "mutually agreeable terms and conditions." The City acquired the property for a cost of approximately $180,000, and made it available to Carley within the time limits provided in the 1984 Agreement.

18. Carley, however, was unable to obtain a restaurateur to operate the restaurant, and has not purchased the building or

moved forward on the project. In fact, Douglas Harbit, Vice President of Carley, advised William Hawkins, Executive Director of the Housing Authority, that Carley was not prepared to move forward with the acquisition and development of the Greek Church restaurant facility. When Carley ultimately did not supply information necessary to the continuation of the UDAG grant application for the restaurant in 1986, the UDAG application was withdrawn. The City continues to own the Greek Church property.

19. The 1984 Agreement required the City and Carley to jointly fund a study of the prospects for a hotel in downtown Newport News. By subsequent agreement, Carley funded the study on its own. The study concluded that a hotel was not feasible at that time. Consequently, Carley did not arrange financing for, and did not go forward with the project, although the land was owned by the City and was available for development.

20. The 1984 Agreement also contemplated the development of a townhouse project. As in the other projects, the City was to acquire the land and make it available within a specified time frame. The parties, however, were unable to reach agreement on terms, particularly the price, for the transfer of the townhouse property to Carley and so the City did not acquire the land.

21. Carley did not perform any work of substance on the Festival Marketplace. The City owned the land and it was available, should Carley have chosen to enter into development.

22. By August 1985, with the River-Park Tower project under construction, Carley turned its attention to the Washington Tower West and Courthouse Office Building projects.

23. The 1984 Agreement outlined the development of a Courthouse Office project. Initially, the Agreement contemplated the sale of the land for the Courthouse Office project to Carley. Due to the requirements of Virginia Code § 15.1–257 which prohibited courts of record from being built on land not owned by the City, the deal was restructured so that the City would own the land and lease it to Carley through a Ground Lease. Carley would build the building and lease the entire building to the City through a Building Lease. The City and Carley were close to agreement on the terms for both leases by late December 1985.

24. Then, in January 1986, the City learned that legislation had been introduced into the 1986 Session of the General Assembly to amend Virginia Code § 15.1–257. The amended version would require that not only the land for courts of record, but also the buildings, must be held by the City in fee. As a result, the City modified its proposed usage of the building to eliminate the Circuit Court. This change, however, required a redesign of the building.

25. The Courthouse Office Ground and Building Leases were debated in a city council meeting on January 28, 1986, and approved subject to certain modifications.

26. In particular, the Courthouse Office Building Lease was approved subject to two contingencies and to a final vote of the city council. First, the city council required several modifications in the main body of the lease including, specifically, the striking of the last sentence of clause I(L)2, and other minor language changes which were to be worked out with counsel for Carley.

27. Second, the final rental price for the Courthouse Office Building Lease was left open, pending the design changes necessary to accommodate the building's changed use. This contingency is reflected in Exhibit B to the lease, which also provided that, should the parties be unable to reach final agreement, there would be no liability one to the other. Exhibit B required that all "modifications, redesigns, and rents" negotiated by the city manager were to be approved by the city council.

28. Due to the pending legislation (Virginia Code § 15.1–257), the City on January 28, 1986, also approved execution of Addendum No. 2 to the 1984 Agreement. This modification provided, among other things,

that the obligation of the City to proceed with the Courthouse project was contingent upon its legal capacity to do so. Carley never executed Addendum No. 2.

29. Despite his understanding that the city council had approved the Courthouse Office Building Lease only subject to modification of Clause I(L)2, Mr. E.D. David, counsel for Carley, in a letter dated February 3, 1986, reinserted the language, which he said council had been "led to believe" was stricken. The lease, as modified by E.D. David, was not presented to the city council for approval, but was, nevertheless, finally signed by the city manager on March 3, 1986.

30. The City, Carley, and VVKR (the architect for the Courthouse Office project) met on March 7, 1986, and agreed upon design changes for the building. However, the City and Carley never reached a final agreement on price terms for the Courthouse Office Building Lease.

31. On or about March 27, 1986, before Carley had signed either of the Ground or Building Leases, the City and Carley learned that further amendments had been made to the pending bill to amend Virginia Code § 15.1–257, and that the bill had been signed by the Governor on an emergency basis (effective immediately) on March 16. These further amendments made it impossible to use leased space for courtroom facilities of any kind.

32. There was some brief discussion between the parties concerning a legal challenge to the legislation, but this was quickly dismissed, since Carley had not signed the leases as of the effective date of the legislation, and because both Carley and the City were concerned about the effect such litigation would have on their ability to obtain loans for the project.

33. On May 12, 1986, David Carley and Douglas Harbit met with City Manager Robert Williams, Mayor Joseph Ritchie, and Acting Director of Development Barbara Sardella, in Newport News, to discuss the future of the Courthouse project. In the meeting, David Carley insisted that he had enforceable rights under *the 1984 Agreement*, neither party made any mention of Article I(L)2, of the Courthouse Building Lease. The parties mutually decided that, rather than pursue a legal challenge to the courthouse legislation, they would attempt to reach an agreement on an alternative development scenario, which would provide additional developmental opportunities to Carley.

34. Although the 1984 Agreement did not obligate the City to rent space in Washington Tower West, the City, by city council action on December 18, 1985, agreed to rent some 40,722 square feet in that building.

35. Upon the approval of the Washington Tower West lease, Carley, acting with the assistance of the Housing Authority, had closed on $9,715,000 in industrial revenue bonds to finance the Washington Tower project on December 12, 1985.

36. However, when the Courthouse project was called into question in March 1986, Carley decided not to proceed with the Washington Tower West project. The decision was to concentrate on obtaining a substitute for the Courthouse project. From this point on, Carley made no attempt to obtain further prelease commitments for the Washington Tower West Building as a stand-alone project. Instead, Carley proposed to reduce that building in scope and to obtain "half a courthouse" in the form of a "Social Service Building" to be leased to the City as its sole tenant. To implement these changes, Carley proposed a series of new development agreements, beginning with the outlines of such an agreement set forth in a letter dated June 12, 1986, to City Manager Williams.

37. City representatives negotiated with Carley in good faith concerning a revised development agreement, particularly concerning proposed City leases for the revised Washington Tower West and a Social Service Building to replace the Courthouse project. At one point, the city council authorized a counteroffer to Carley's new development proposal. The counter offer was transmitted to Douglas Harbit on August 22, 1986. Furthermore, on September 9, 1986, the city council approved actual leases with Carley for the Washington

Tower West and Social Service Buildings, which leases were never executed for various other reasons.

38. In the spring of 1986, the City had cooperated with Carley in submitting a UDAG application to the Department of Housing & Urban Development for the Washington Tower West project. And when the initial proposal did not meet HUD's threshold requirements and was rejected, the City cooperated with Carley in submitting a revised proposal based upon the reduced-in-scope Washington Tower West project, in the summer of 1986.

39. That revised Washington Tower West proposal reduced the square footage to 125,000 square feet, and required the City to enter into a lease for only 34,000 square feet, with Carley, or the City, having the right to cancel the lease at the end of seven years if an acceptable substitute tenant could be found. The proposal called for $8.2 million of bond funds. Carley proposed to package this deal with a separate Social Service Building, which the City would commit to lease in its entirety prior to construction.

40. Harbit explained both of these concepts to Geoff Sears of Chemical Bank's Real Estate Division in his letter of July 18, 1986. There he stated that the compromise, in essence, was to build "half a courthouse" in the form of a Social Service Building, and to revise downward the size of the Washington Tower West. The letter contained an attached pro forma showing how the two projects would "fit together to create a viable development in downtown Newport News." More specifically, the pro forma for Washington Tower West showed "first year positive cash flow of approximately $20,000 and increases to $331,000 by year seven." Both of these projects were to be discussed at a meeting between Harbit and Sears, scheduled for July 24, 1986.

41. Prior to his meeting with Sears, however, Harbit/Carley prepared a new pro forma for the Washington Tower West Building, which carried a base first mortgage amount for the Washington Tower West project of $8.2 million, projected a net operating income of $388,000 in year one, and showed a positive cash flow. Significantly, the mortgage debt service in this pro forma was only $574,000 in year one, and the only income shown was rental income. As noted, the project was to be assisted by a low interest UDAG loan.

42. On July 24th, Harbit met with Sears. During these discussions, Sears "suggested that we create a scenario whereby we could justify borrowing the full $9.7 million in IRBs for Washington Tower West and escrow the extra $1.5 million with Chemical." This additional money was to be used by Carley as cash flow permitted, and in the meantime would earn interest at a higher rate than the 75% of prime rate, which was to be imposed on the revised first mortgage loan of $9.7 million.

43. According to Harbit, "to justify this additional money to UDAG, Geoff and I agreed to adjust the pro forma to reduce income and thus create the need for a large debt service reserve fund." He created a revised pro forma of August 5th which "does this." It creates a $4 million "debt service" fund which would be made up of $1 million in UDAG cash, $1.5 million in Carley cash (in reality the extra borrowing which would be carried as "equity" in Carley "Sources and Uses of Capital" table), and $1.5 million as the Carley letter of credit or guarantee.

44. Harbit confirmed this in a letter to Sears, enclosing a copy of the revised pro forma for Washington Tower West, indicating a $1.75 million UDAG loan and describing "how we have had to create the picture of a significantly worsened Washington Tower West in order to justify the UDAG. This has been done by reducing income along the lines which you and I discussed and covering the shortfalls with a $4 million 'debt service reserve fund'." The $1.5 million for the debt service reserve fund would actually come from the increased borrowing in the first mortgage. Harbit enclosed a "draft" letter for Chemical Bank to sign and send back demanding the $4 million reserve fund. Sears retyped the letter on Chemical Bank stationery, signed it, and sent it back.

45. Carley submitted the altered pro formas, "adjust[ed] ... to reduce income and thus create the need for a large debt service reserve fund" to Mr. Ted Figura, the City Grants Administrator, on or about August 8, 1986. Mr. Figura relied upon this information in preparing revised financial analyses of the project in support of the Washington Tower West UDAG application, which was in the process of being submitted to HUD.

46. By letter dated September 3, 1986, Mr. Berton Tanner, an official of HUD in Washington reviewing the UDAG application, requested several additional pieces of information from both the City and Carley. Mr. Figura promptly supplied the information requested of the City.

47. Mr. Tanner also requested several pieces of information to be supplied by Carley Capital Group. Specifically, Tanner requested a "But For" letter from Carley, indicating that should the UDAG not be awarded, the developer would not proceed with the project. Both Mr. Tanner and Mr. Figura discussed the implications of the "But For" letter with Mr. Harbit in telephone conversations in early September 1986. In particular, Mr. Figura told Mr. Harbit that it was his understanding that the Carley Capital Group could be barred from receiving further UDAG grants if its request for UDAG was turned down, but Carley went forward with the Washington Tower West project anyway, without the UDAG.

48. Harbit failed to provide a lending commitment from a financial institution, in the form required by HUD, and requested in Mr. Tanner's September 3, 1986 letter.

49. In fact, on September 11, 1986, Mr. Harbit wrote Mr. Tanner, advising him that Carley would not be providing the lender commitment letter, stating that Chemical Bank, Carley's lender, would not provide such a letter, due to changes made in the leases for the Washington Tower West Building and the Social Service Building, by the city council in their meeting of September 9, 1986.

50. Mr. Sears, the Chemical Bank representative, testified, in his deposition, however, that he does not remember even a telephone call from Hr. Harbit about the City's action on the two leases, either before or after the letter arrived. Mr. Sears further testified that he had no intention of going to the Chemical Bank loan committee on behalf of the Washington Tower West project, because he had reservations about the City's use of space and the type of tenants involved. He made no mention of the lease modifications which Harbit contended affected the financing.

51. Following the withdrawal of the UDAG application, Carley made a number of proposals for new development agreements to the City, throughout the fall of 1986, each of which were perceived by the City to require greater financial investments by the City. Carley made a final proposal in December 1986, but City officials, by letter dated January 15, 1987, rejected that proposal, and suggested that further discussions proceed on an individual project basis. Carley refused to agree to such an approach and failed to provide the City with any further development proposals. The Newport News Redevelopment and Housing Authority did not participate in this exchange of correspondence, or in related negotiations.

## CONCLUSIONS OF LAW

The court has jurisdiction in this case, pursuant to the provisions of 28 U.S.C. § 1332, in that there is diversity of citizenship between plaintiffs and defendants, and the amount in controversy exceeds $10,000, exclusive of interests and costs.

Since this case arises under the court's diversity jurisdiction, and all of the contracts at issue were either executed in, or to be performed, in Virginia, Virginia law applies to the claims herein. *Klaxon v. Stentor*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), *mandate conformed*, 125 F.2d 820 (3rd Cir.1942), *cert. denied*, 316 U.S. 685, 62 S.Ct. 1284, 86 L.Ed. 1757 (1942).

Plaintiffs' claims are based on alleged breaches of three agreements (or sets of agreements), (1) the Washington Tower

West Agreements; (2) the Courthouse Office Building Leases; and (3) the 1984 Amended and Restated Development Agreement.

■ In order to recover for breach of any of these contracts, plaintiffs must prove, by a preponderance of evidence: the existence of duly executed and enforceable agreements; *Chittum v. Potter*, 216 Va. 463, 219 S.E.2d 859, 863 (1975); performance, or offers to perform by plaintiffs in accordance with the terms of the contracts; *Lutz v. Currence*, 96 W.Va. 468, 123 S.E. 251 (1924); *Trout v. Trout*, 86 Va. 295, 9 S.E. 1121 (1889); that the defendants have failed to perform under or breached the agreements; *Payne v. Grant*, 81 Va. 164 (1885); that the breaches are the cause of actual damages sustained by plaintiffs; and that those damages are recoverable under Virginia law. *Haass & Broyles Excavators Inc. v. Ramey Bros. Excavating Co.*, 233 Va. 231, 355 S.E.2d 312, 315 (1987); *APCO v. John Stewart Walker, Inc.*, 214 Va. 524, 201 S.E.2d 758 (1974). In addition, where an agreement requires a demand for performance before suit is brought, demands must be made upon defendants in accordance with the specific terms of the agreements. *McClellan v. Ashley*, 200 Va. 38, 104 S.E.2d 55, 59–60 (1958). The court concludes that the plaintiffs have failed to meet these burdens with respect to the agreements sued upon.

■ Plaintiffs' claims on the Washington Tower West project are based upon alleged breaches of the Washington Tower West Development Agreement, the Washington Tower West Agreement of Purchase and Sale and the Washington Tower West Agreement of Sale, between Plaintiff Washington Tower West Limited Partnership, and Defendant Newport News Redevelopment and Housing Authority. A separate claim is made upon an office lease for the Washington Tower West project, between Washington Tower West Limited Partnership and the City of Newport News.

The Defendant Newport News Redevelopment and Housing Authority, has not breached any of the Washington Tower West agreements. The Housing Authority acquired the land necessary for the Washington Tower West project, and was willing and able to transfer the site to the Washington Tower West Partnership, upon written demand for transfer, as required by the agreements. No such demand was ever made, nor did Washington Tower West tender the purchase money note to acquire the site, as required by Article 2.2 B of the Agreement of Purchase and Sale.

■ The Washington Tower West Limited Partnership never furnished the construction drawings or the evidence of financing necessary to go to closing, as required by the agreements. There can be no breach of agreement to transfer real property when the party asserting the breach has made no demand for performance or has not offered to perform. *Lutz v. Currence, supra.*

■ With respect to the Washington Tower West Office Building Lease, there is evidence that the city council approved such a lease on December 18, 1985. However, plaintiffs have failed to prove the existence of an executed original, or even an executed copy of the Washington Tower West Office Lease.

Moreover, the plaintiffs' failure to acquire the site upon which to construct the building to be leased excuses any performance by the City on the Washington Tower West Building Lease. And the plaintiffs have suffered no damages in connection with the Washington Tower West project.

■ Plaintiffs also allege that the City breached a Ground Lease and an Office Building Lease for the project known as the Courthouse Office Building. The plaintiffs have failed to prove any actual breach of contract for these leases. The plaintiff, 2500 Washington Avenue Associates, failed to take possession of the ground under the Ground Lease, failed to tender the rent required under the Ground Lease, failed to give notice of default, and failed to construct the building to be leased on the Ground Lease.

■ With respect to the Building Lease, the plaintiffs have failed to estab-

lish, by a preponderance of the evidence, an executed lease in the form approved by city council. Although plaintiffs introduced into evidence a form of the Office Building Lease, executed by the city manager, this is not the lease in the form approved, by the city council, on January 28, 1986. The city manager was not authorized to sign a lease which differed in any material respects from the lease approved by the city council, and the City cannot be bound by the unauthorized acts of its agents. Newport News City Charter, §§ 4.02, 5.05(g); *Stendig Development Corp. v. City of Danville*, 214 Va. 548, 202 S.E.2d 871 (1974); *Leonard v. Town of Waynesboro*, 169 Va. 376, 193 S.E. 503, 506 (1937).

Independently of this ground, plaintiffs failed to prove the existence of an enforceable final Courthouse Office Building Lease. Even the lease relied upon by plaintiffs was contingent upon a redesign of the Courthouse Building and the negotiation of a final rent between the city manager and plaintiff, 2500 Washington Avenue Associates, with the express condition that the final rent negotiated would have to be resubmitted for approval by city council. There was no agreement as to the final rent for the Courthouse Office Building Lease and none was resubmitted and approved by the city council.

Plaintiffs' claims for breach of these two leases must also fail, as a matter of law, because the plaintiffs never gave the City a notice of default, in writing, under either of these two leases. This was a material precondition to any suit based upon either the Ground Lease or the Building Lease.

[8] Finally, plaintiffs allege breaches of the 1984 Agreements. The court finds that the City and the Housing Authority did not breach any enforceable obligations under the 1984 Amended and Restated Development Agreement. In fact, by late 1986, any further performance by the City and the Housing Authority, under the agreement, was excused by Carley Capital Group's own failures to perform. *R.G. Pope Const Co., Inc. v. Guard Rail of Roanoke, Inc.*, 219 Va. 111, 244 S.E.2d 774, 780 (1978).

The 1984 Amended and Restated Development Agreement was not a self-executing document, but was contingent upon the negotiation of subsequent agreements to establish "mutually agreeable terms and conditions", for acquisition, availability, and transfer of land for the projects set forth in the Agreement. The City, the Housing Authority and the plaintiffs did negotiate in good faith a number of specific implementing agreements including agreements for the transfer and sale of the sites for the RiverPark Tower and for Washington Tower West. They also reached agreement on a Ground Lease in connection with the Courthouse Office project, although they were never able to reach a final agreement on "mutually agreeable terms" for the Courthouse Office Building itself.

The City or the Housing Authority, acquired and had available for transfer and development by Carley, each of the following sites: the Greek Church site, the hotel-retail complex site, the Festival Marketplace site, the Washington Tower West site, the Courthouse Office Building site, and the RiverPark Tower site. Only the Townhouse site was not acquired within the specified time frame and that because no agreement could be reached on transfer price between the City and Carley. Any obligations of the defendants to acquire land, or to make land available to the plaintiffs, pursuant to the 1984 Agreement, were complied with.

The plaintiffs were not "guaranteed" the right to proceed with any or all of the projects set forth in the 1984 Agreement, simply because one or more of the projects were in fact built.

Plaintiffs, themselves, decided not to proceed with certain projects, including the Greek Church restaurant, the hotel-retail complex, and other projects.

The City's letter of January 15, 1987, cited by plaintiffs as a repudiation of the 1984 Agreement, is insufficient to constitute a repudiation of the Agreement. The letter, by its terms, did not refer to the 1984 Amended and Restated Development Agreement, but rather, only to Carley Capi-

tal Group's "latest proposal" dated December 15, 1986, which had been offered by Carley as a replacement for the 1984 Agreement, and which had largely been abandoned. In order for the letter to constitute a repudiation by the City, it would have had to clearly and unequivocally evidence an intent, wholly inconsistent with the intention to perform the contract. *Link v. Weizenbaum*, 229 Va. 201, 326 S.E.2d 667, 668 (1985); *Board of Supervisors of Fairfax County v. Ecology One*, 219 Va. 29, 245 S.E.2d 425, 427–28 (1978). The City's offer to Carley to continue to work on a project-by-project basis was consistent with both parties' own conduct during the summer and fall of 1986, when they continuously attempted to pursue some of the projects in the 1984 Agreement, while others were allowed to fall by the wayside, such as the Greek Church and the hotel-retail complex which were dropped as not financially feasible.

■ Furthermore, there can be no anticipatory repudiation, as a matter of law, when there are co-obligors to an agreement, and only one obligor evinces an intent inconsistent with the continuation of performance. Even if Mr. Maroney's letter of January 15, 1987, could be construed as a repudiation, it is undisputed that the co-obligor, the Newport News Redevelopment and Housing Authority, never gave any notice of repudiation of its obligations under the 1984 Agreement. Plaintiffs' failure to prove such an action is fatal to their claim of anticipatory repudiation, since a repudiation must not only be clear and unequivocal, it must also cover the entire performance of the contract and include a repudiation by the co-obligor. *Link v. Weizenbaum, supra.*

■ Under Virginia law, plaintiffs may not recover damages for lost profits on the Courthouse Office Building. The project was never built. No final Building Lease was ever signed. Plaintiffs' claimed damages were based on claimed lost value ("lost profits") for a real estate project which has never been built. Plaintiffs' damage analysis relies on projected estimates of rent, building costs, operating ex-

penses, and projected cap rates. As such, the project would be a new business, a "speculative venture, the successful operation of which depends upon future bargains, the status of the market, and too many other contingencies to furnish a safeguard in fixing the measure of damages." *Mullen v. Brantley*, 213 Va. 765, 195 S.E. 2d 696, 699–70 (1973); *see also, Coastland Corp. v. Third National Mortgage Co.*, 611 F.2d 969, 977 (4th Cir.1979). Similarly, in *Sinclair Refining Co. v. Hamilton & Dotson*, the court states that "[w]here the business which is interfered with or prevented as a result of a breach of contract is a new or unestablished nonindustrial business ... the anticipated profits from such business cannot be recovered, for the reason that it cannot be rendered certain that there would have been any profits at all from the conduct of such business." *Sinclair Refining Co. v. Hamilton & Dotson*, 164 Va. 203, 178 S.E. 777, 780 (1935).

■ Plaintiffs' claimed diminution in value damages for the RiverPark Tower project suffer the same defect. The alleged damages for RiverPark Tower were based on expert testimony, which evaluated the RiverPark Tower project on a projected basis *with* the Courthouse Office Building and the Washington Tower West projects being built, and on a projected basis *without* the Courthouse Office Building and the Washington Tower West projects. These damages are unrecoverable because they are based on speculation, conjecture, and assumptions, which are incorrect as a matter of fact and speculative. *Sinclair Refining Co., supra.* No evidence was presented by a qualified real estate appraiser, based on a proper appraisal, that Carley got less than he contracted for in the RiverPark Tower building.

Even the projections that were used by plaintiffs to establish the performance of RiverPark Tower, both with and without these two projects, were based upon assumptions, estimates, and forecasts of increases in rental rates and operating expenses, none of which were sufficiently established. These lost profit damages, therefore, also must be denied as based on

speculation and conjecture. *Lavay Corp. v. Dominion Federal Savings & Loan Ass'n*, 830 F.2d 522, 529 (4th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988); *Mullen v. Brantley*, *supra*.

▮ Plaintiffs' alternative "reliance" or "out-of-pocket" damages theory, used with respect to RiverPark Tower, must be rejected as well. Plaintiffs attempted to prove the lost value of their investment in the RiverPark Tower project by putting into evidence the amount of plaintiffs' equity investment and additional cash investment to cover operating losses and debt service. It is undisputed, however, that the investments by plaintiffs were made in a project which plaintiffs continue to own as an income-producing property. Although plaintiffs established an initial value for the project, based on an appraisal put into evidence, plaintiffs failed to put into evidence any *current* value of the project based on an acceptable appraisal performed in accordance with accepted appraisal methods. Therefore, plaintiffs are not entitled to recover any reliance damages on the theory of lost investment value in the RiverPark Tower project, because they have not proven a loss. *Restatement (Second) of Contracts*, § 349; *In re Vecco Construction*, 30 B.R. 945 (Bankr.E.D.Va. 1983), *judgment amended*, 33 B.R. 757 (Bankr.E.D.Va.1983); *Brenneman v. Auto–Teria, Inc.*, 260 Or. 513, 491 P.2d 992, 995 (1971).

▮ Plaintiffs also attempted to recover so-called out-of-pocket development expenses incurred between 1983 and 1986, on various of the projects. However, plaintiffs' damages were based on estimates and after-the-fact attempts to allocate damages, since plaintiffs maintained no accounting system which would actually capture payroll costs, on a project-by-project basis, during the period 1983 through 1986. These damages were not calculated with sufficient certainty to allow recovery.

▮ If any damages were appropriate, the 1984 Agreement specifically provides for the payment of liquidated damages. Section 5(a) provides only for reimburse-ment of Carley's architect fees in the eventuality that the parties fail to reach agreement on lease terms for the Courthouse Office Building. Parties to a contract may agree in advance upon the amount to be paid for loss which may result from a breach of contract, and such provisions will be enforced "when the actual damages contemplated at the time of the agreement are uncertain ... and when the amount fixed is not out of proportion to the probable loss". *Taylor v. Sanders*, 233 Va. 73, 353 S.E.2d 745, 747 (1987). It appearing that the amount of damage was uncertain and the amount fixed is proportionate, plaintiffs' "out-of-pocket" expenditures on the Courthouse Office Building must be liquidated to any architect fees it incurred, of which there are none.

Lastly because the 1984 Agreement provided for recovery of "predevelopment" expenses only in connection with the Courthouse Office Building, it follows by implication from the absence of such provisions with regard to the other projects, that Carley is precluded from recovering such expenses on any of the other projects set forth in the 1984 Agreement.

For the foregoing reasons, no damages can be sustained by the plaintiffs on their claims against the defendants.

As to the counterclaims raised by defendants against Carley, defendants allege breaches of the contract and the subsequent agreements, and fraud. As such, defendants must show the elements of a breach of contract claim as enumerated above.

▮ Defendants' claims on the River-Park Tower project do not satisfy these elements. While implementing agreements were executed for RiverPark Tower, Carley performed its contractual obligations under those agreements. The two specific breaches alleged are that Carley failed to complete the RiverPark Tower within 24 months of construction-start and failed to contribute its required $3 million equity investment. In fact, Carley met its obligations. Although there was a ceremonial ground-breaking for the Tower on May 21,

1984, construction did not actually begin until October of 1984. Carley substantially completed construction by the end of October 1986 when the certificate of occupancy was issued for the building. Carley substantially performed this obligation. Additionally, the evidence showed that Carley contributed their professional developer's fee of $1 million and cash investments of over $2 million in satisfaction of the requirement that Carley contribute $3 million in equity to the project.

■ Moreover, even if there had been a breach, there is no damage to defendants as a result of their participation in River-Park Tower. While there was some drawdown in the debt service reserve fund which caused the defendants to have to deposit $750,000 into the fund, defendants have not been damaged by this additional contribution or by any other alleged breach by the plaintiffs under the RiverPark Tower agreements. Carley obligated itself to reimburse the City for the $750,000, and the City has recourse against the assets of the RiverPark Tower project to satisfy this obligation if and when it is defaulted upon.

■ Defendants' claims on the Greek Church property do not satisfy the elements of breach of contract, either. Carley did not breach its obligations with regard to the Greek Church property. The 1984 Agreement expressly conditioned Carley's obligation to go forward on "prevailing market conditions". Community opposition, failure to obtain UDAG financing, difficulty pursuing other downtown redevelopment and the inability to locate a qualified restaurant operator caused both parties mutually to recognize the need to defer action on the Greek Church restaurant.

Nor did defendants suffer any damage as the result of any alleged breaches by plaintiffs on the Greek Church restaurant. Defendants introduced no evidence that the value of the property has diminished from the time they bought it.

Similarly, with regard to the Washington Tower West project, the parties made a mutual decision not to pursue the project, due to indications that it was not financially profitable and due to difficulty financing

it. Had there been a breach, defendants could not recover for it because they have suffered no damage. They still own the property and have offered no evidence that the value of the property has diminished. In fact, the evidence indicates that property values have risen in the development area and the City has a more valuable piece of ground if and when they desire to develop it.

In the case of the Townhouse project, no implementing agreements were ever negotiated and signed. Fundamental disagreements over the price of the land to be acquired by the City and sold to Carley, prevented the solidification of any binding agreement with regard to the Townhouse project.

The defendants also allege fraud counterclaims. They allege that Carley made representations that induced them to enter into the various agreements in issue including: that the RiverPark Tower project was "viable"; that there were "reasonable prospects" for attracting tenants to the Washington Tower West project; that Carley was prepared to move forward with the Greek Orthodox Church renovation and to invest $500,000 in construction costs in that project; that the 51 unit townhouse development would require "no subsidy of any kind"; and that Carley was prepared to move forward with $30–40 million in development projects for the City of Newport News. Additionally, they allege that Carley deliberately failed to disclose material details of the financing for the Washington Tower West project.

■ In order to establish actual fraud, defendants must prove by clear and convincing evidence, that Carley intentionally and knowingly made a false representation of material fact with the intent to mislead, that defendants justifiably relied to their detriment on such misrepresentation, and that such reliance resulted in injury. *Winn v. Aleda Construction Co.,* 227 Va. 304, 315 S.E.2d 193, 195 (1984).

■ In order to establish constructive fraud, the defendants would have to prove, by clear and convincing evidence that Car-

ley made a materially false representation, that defendants believe it to be true, that Carley intended for it to be acted upon, and that defendants suffered injury as a result of acting upon it. *Nationwide Insurance Co. v. Patterson*, 229 Va. 627, 331 S.E.2d 490, 492 (1985).

■ The City failed to show either actual or constructive fraud. None of the statements which allegedly induced defendants to enter the Agreements were materially false representations of fact. The statements that RiverPark Tower was viable, that there were "reasonable prospects" for attracting tenants to Washington Tower West and that the townhouse project would require no "subsidy" are expressions of opinion which as a matter of law cannot form the basis for a claim of fraud. *See e.g., Watson v. Avon Street Business Center, Inc.*, 226 Va. 614, 311 S.E.2d 795, 798 (1984). Furthermore, the evidence did not establish that these statements were false when made or that they were intended to mislead. In fact, the statements were consistent with market and economic feasibility studies performed at the time.

Like the previous statements, the statement that Carley was prepared to move forward with the Greek Church Restaurant project, and that it was prepared to move forward with $30–40 million in development projects for Newport News, are not representations of fact and could form the basis for a fraud claim only if Carley made the promises with no intention to perform them. *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 325 S.E.2d 91, 94 (1985). The evidence at trial showed that Carley did attempt to move forward on these matters by seeking a restaurateur, submitting UDAG applications, commissioning market studies, hiring a local representative, etc.

Defendants also allege that Carley misrepresented its experience in handling large urban redevelopment projects. Carley presented adequate evidence of such experience to show that such representations were not materially false.

Finally, defendants contend that Carley defrauded them through manipulation of the pro forma rent projections for Washington Tower West. As noted, the evidence at trial permits no conclusion that such representations were either false or misleading. In addition, the evidence established at trial that the defendants could not have relied upon the alleged misrepresentations, since the statements took place between July and September of 1986, and defendants acquired the property by May 14, 1986. Beyond that defendants have not shown that they suffered any injury by relying on such representations. They still hold the Washington Tower West site and presented no evidence of its diminution in value. Consequently, the defendants have failed to prove by clear and convincing evidence that Carley committed any act of actual or constructive fraud in connection with the Newport Centre Plan and the parties' contracts.

For the foregoing reasons, no damages can be sustained by the defendants against the plaintiffs on the counterclaims.

An appropriate order shall issue granting judgment to the defendants on the complaint and to the plaintiffs on the counterclaims.