# CIRCUIT COURT OF FAIRFAX COUNTY

Ana G. Arias et al.

v.

Jokers Wild, Inc., et al.

May 2, 2007

Case No. (Civil) CL 2005-2513

BY JUDGE RANDY I. BELLOWS

 The purpose of this Letter Opinion is to decide the plaintiffs' claims and the defendants' counterclaims associated with the above entitled matter. The plaintiffs' Second Amended Complaint (hereinafter "Amend. Compl.") filed on February 14, 2006, and the defendants' Counterclaim filed on May 25, 2005, are the precise matters giving rise to the trial before the Court. The ten-day trial in this case concluded on August 7, 2006. The parties submitted written closing arguments, with the final reply brief submitted on November 6, 2006. The Court presided over a Rule to Show Cause hearing on December 8, 2006. This matter is now ripe for decision.

Also before the Court are cross-motions to strike made during the course of the trial, which the Court took under advisement. Specifically, the Court took the following issues under advisement: whether Mr. Jean-Richard could be liable on the plaintiffs' breach of contract claim when he did not sign the Stock Purchase Agreement, the legitimacy of the plaintiffs' Blue Sky Laws claim, and all three counts of the defendants' counterclaim. For the reasons articulated in the legal discussion of this Letter Opinion, both the plaintiffs' and the defendants' motions to strike are denied.

*Factual Background*

*Pre-2004*

This case arises out of the relationship between plaintiffs, Ms. Ana G. Arias ("Ms. Arias") and her brother, Mr. Rene Amilcar Arias Ruiz ("Mr. Ruiz"), and defendants, Jokers Wild, Inc., Mr. Raoul Jean-Richard ("Mr. Jean-Richard"), Ms. Edna Jean-Richard ("Ms. Jean-Richard"), and Jean-Richard and Associates, L.L.C. ("JRA"). The parties' relationship dates back to the early 1990s. Ms. Arias and Mr. Jean-Richard formerly worked together in the hospitality and food service industry at a hotel where Mr. Jean-Richard was executive chef and Ms. Arias was a line-cook under his supervision. Trial Tr. 454. Since the 1990s, the parties kept in touch with each other two to three times per year. Trial Tr. 455 and 930.

*April 2004*

In April 2004, recognizing her limited English skills and formal education,[1] coupled with her lack of business experience,[2] Ms. Arias approached Mr. Jean-Richard seeking his advice in purchasing a restaurant. Trial Tr. 456. At this meeting, Mr. Jean-Richard suggested that Ms. Arias speak with his wife, Ms. Jean-Richard, because she was more familiar with the operations and logistics of the restaurant business. Ms. Jean-Richard earned a college decree and had a professional background in banking as a currency

---

[1] Trial Tr. 453, 476. Ms. Arias is an immigrant from El Salvador who only achieved a sixth grade education in El Salvador. *Id.*

[2] According to Ms. Arias, she was not familiar with a cash flow schedule, a corporate budget, or a break-even analysis. Trial Tr. 614-15.

trader for a Swiss Bank in Switzerland. Ms. Jean-Richard held this position for over five years. Trial Tr. Vol. 6 at p. 8. At his suggestion, Ms. Arias spoke with Ms. Jean-Richard to obtain advice about purchasing ·a restaurant; particularly whether a restaurant for sale in Alexandria, Virginia, the El Paso restaurant, would be a good investment. Ms. Jean-Richard met with Ms. Arias and gave Ms. Arias her opinion on the El Paso restaurant, namely, that this was not a good investment.

At some point after Ms. Jean-Richard provided Ms. Arias her view on the El Paso restaurant, Ms. Arias agreed to purchase from the Jean-Richards their current restaurant, Bistro 123.[3] This was done at Ms. Jean-Richards' suggestion and with the Jean-Richards' encouragement. Ms. Arias testified that the Jean-Richards telephoned her and requested Ms. Arias to meet with them "so they could talk" after Ms. Arias had difficulty in finding a restaurant to purchase that she could afford. Trial Tr. 464. After this telephone conversation, Ms. Arias met with the Jean-Richards. During this meeting, the Jean-Richards offered to sell Ms. Arias their current restaurant located in Vienna, Virginia. *Id.* at 464-65. It was the Jean-Richards' idea for Ms. Arias to buy their restaurant. The Jean-Richards were in the process of negotiating the opening of a new restaurant to be located in Tyson's Corner, Virginia. In February 2004, the Jean-Richards and a number of other parties formed Jean-Richard and Associates, L.L.C., and decided to open another restaurant located in Tyson's Corner, Virginia. Trial Tr. 937, 942. According to Ms. Jean-Richards' testimony at trial, the defendants entered negotiations for the Tyson's Corner restaurant in March 2004. Trial Tr. Vol. 6 at p. 28. The grand opening of the Tyson's Corner restaurant was May 5, 2005, according to Mr. Jean-Richard. Trial Tr. 942. Ms. Arias initially believed she could not afford

---

[3] Trial Tr. 465. Since 1997, the Jean-Richards owned and operated a restaurant, Bistro 123, located in Vienna, Virginia. Jokers Wild, Inc., is the trading name for Bistro 123. Specifically, the Jean-Richards entered into a commercial lease with Dr. James E. Anderson on September 15, 1997. Trial Tr. 56. Dr. Anderson purchased the property in the early 1970s. Trial Tr. 56. The Jean-Richards' lease commenced on September 15, 1997, and expired on August 31, 2007. Although the lease expired in 2007, the lease included two possible five year extensions of the termination date. Trial Tr. 84. Under the terms of the agreement, the Andersons were not required to agree to the lease extension. If the Jean-Richards and Dr. Anderson could not reach an agreement by January 31; 2007, regarding the extension of the lease, the lease would terminate on August 31, 2007. *Id.* At some point in 2003, Dr. Anderson began negotiations for the sale of the property where Bistro 123 was located with Mr. Jay Donegan. Trial Tr. 105-06. In 2003, the Jean-Richards knew that Dr. Anderson was negotiating the sale of the building to Mr. Donegan. *Id.* at 943.

the Jean-Richards' restaurant. In response to Ms. Arias' financial concerns, Ms. Jean-Richard asked Ms. Arias, "don't you have a house that you can put down?" to which Ms. Arias responded, "no, I wouldn't like to put my house in jeopardy." Trial Tr. 465. Ultimately, Ms. Arias agreed to purchase Bistro 123 from the Jean-Richards.

Recognizing Ms. Arias' financial concerns and financial inexperience, the Jean-Richards arranged for Ms. Wei Grandon to assist Ms. Arias in obtaining a loan to purchase Bistro 123. Trial Tr. 469-70 (indicating that when Ms. Arias first spoke with Ms. Grandon, Ms. Grandon was already familiar with Ms. Arias' situation and desire to purchase Bistro 123 from the Jean-Richards). Ms. Grandon was a "broker" whom the Jean-Richards told Ms. Arias would be able to help her obtain the line of credit she needed. Trial Tr. 467. Ms. Arias testified that she paid Ms. Grandon $5,000 for assistance in obtaining a line of credit to purchase Bistro 123. Trial Tr. 468. Ultimately, Ms. Arias obtained a $70,000 line of credit loan with Ms. Grandon's assistance. Trial Tr. 471.

*July 2004*

The parties memorialized their arrangement in a formal Letter of Intent (hereinafter Letter of Intent). Pl.'s Ex. 90. The terms of the Letter of Intent were as follows: The buyers would "assume" the Jean-Richards' current lease in the property where Bistro 123 was located and the Jean-Richards would sell their entire interest in Jokers Wild, Inc., for a selling price of approximately $230,000. The lease between Dr. Anderson and the Jean-Richards concerning Bistro 123 included an assignment provision which stated that assignments were not prohibited, provided that Dr. Anderson and the Jean-Richards agreed to the assignment in writing before the assignment became effective. Ms. Arias was obligated to pay the Jean-Richards $130,000 in "readily available funds at closing" and give the Jean-Richards a promissory note for the remaining $100,000. 18 Pl.'s Ex. 90. In return, Ms. Arias would run, operate, and own Bistro 123.

Subsequent to the Letter of Intent, the Jean-Richards crafted an alternative plan in the event that Dr. Anderson did not approve of the lease assignment. In that event, Ms. Arias and the Jean-Richards would enter into a Management Operating Agreement, (hereinafter "MOA"), which would replace the parties' existing arrangement. Under the MOA, Ms. Arias would become the Jean-Richards' employee as a manager of Bistro 123 and she would keep all profits earned by Bistro 123 under her operation. She would still be contractually obligated to pay the $230,000.

Ms. Arias paid Ms. Jean-Richard $30,000 as a deposit at the time the parties entered into the Letter of Intent. Trial Tr. 473, 477. Ms. Arias viewed the Letter of Intent and the $30,000 deposit as "the first step to purchase a restaurant." Trial Tr. 477. According to Ms. Arias, at the time she signed the Letter of Intent and paid the Jean-Richards the $30,000 deposit, she believed she was acquiring a restaurant. Trial Tr. 480. The settlement date for the restaurant transaction was set for August 14, 2004.

After Ms. Arias agreed to purchase Bistro 123 from the Jean-Richards, Mr. Jean-Richard informed her that it would be best if he communicated with Dr. Anderson on her behalf. Trial Tr. 1004. According to what Mr. Jean-Richard told Ms. Arias, Dr. Anderson preferred to work with men rather than women. Mr. Jean-Richard also discouraged Dr. Anderson from speaking with Ms. Arias. Indeed, at one point, Dr. Anderson actually asked Mr. Jean-Richard if he could speak directly to Ms. Arias. Mr. Jean-Richard responded, "No, no. . . . She has her own lawyer and she can read English." Trial Tr. 113. Ms. Arias did not actually have her own attorney at this point because Mr. and Ms. Jean-Richard told Ms. Arias that she could cut costs for both parties if she used the Jean-Richards' attorney. Trial Tr. 476. See also, Trial Tr. 1871.

Subsequent to the Letter of Intent, Mr. Jean-Richard apprised Dr. Anderson of the parties' Letter of Intent and the Jean-Richards' desire to assign the lease to Ms. Arias. Dr. Anderson responded to the Jean-Richards by letter. In his letter to Mr. Jean-Richard (hereinafter Dr. Anderson's July letter), Dr. Anderson told the Jean-Richards that he would not contemplate the lease assignment unless Ms. Arias was informed that the "lease would not be renewed" past August 31, 2007. Trial Tr. 104. Specifically, Dr. Anderson would not consider the lease assignment to Ms. Arias unless the following conditions were met: (1) Ms. Arias provided Dr. Anderson a sound business plan, (2) Ms. Arias provided Dr. Anderson financial information concerning her financial situation, and (3) Ms. Arias was informed that the lease would not be extended past August 31, 2007, because Dr. Anderson intended to sell the building. Furthermore, in Dr. Anderson's July letter, Dr. Anderson explicitly informed Mr. Jean-Richard that the building where Bistro 123 was located was "under contract for sale" and that Dr. Anderson was "prohibited under the terms of the contract from making any changes to the leases on the property without the consent of the contract purchaser." Pl.'s Ex. 46.

In a facsimile transmission to Ms. Arias, Mr. Jean-Richard relayed only a portion of Dr. Anderson's requirements to Ms. Arias,[4] first, that Dr. Anderson required that she draft and submit to him a business plan and, second, that Dr. Anderson required financial documentation demonstrating Ms. Arias' financial suitability for the lease assignment. Compare Pl.'s Ex. 55 (the facsimile Mr. Jean-Richard sent to Ms. Arias) with Pl.'s Ex. 46 (Dr. Anderson's July letter in its entirety). Missing from the facsimile was Dr. Anderson's statement that the lease would *definitely* expire in August 2007. Dr. Anderson's July letter contained the following sentence, "As stated in my earlier letter, the Lease expires August 31, 2007, and no assignment will be permitted unless that fact is fully disclosed to the assignee, and consented to in writing by the assignee." Pl.'s Ex. 46. That statement was redacted from the copy faxed to Ms. Arias. In addition, Dr. Anderson's July letter unequivocally states, "I have discussed your request with the contract purchaser [of the building where Bistro 123 is located], and they have clearly stated that no extension of the Lease will be considered." *Id.* That statement was redacted as well. Finally, the identity of the building's intended purchaser, Mr. Jay Donegan, was deleted as well by Mr. Jean-Richard when he redacted the "CC" in the letter which indicated that a copy of the letter was sent to Mr. Donegan.

The Court finds that Mr. Jean-Richard intentionally altered Dr. Anderson's July letter before transmitting it to Ms. Arias, and, further, that he did this in an effort to hide from Ms. Arias the fact that the lease would expire in August 2007. Moreover, not only did Mr. Jean-Richard affirmatively delete the most critical portion of Dr. Anderson's July letter before sending it to Ms. Arias, but Mr. Jean-Richard attempted to conceal the fact that he had altered Dr. Anderson's July letter by inserting a signature block with Dr. Anderson's signature at the end of the transmitted letter. This "cut and paste" job made it appear that there were no redactions in the letter and that Ms. Arias had the entire document. She, of course, did not.

---

[4] Dr. Anderson's July letter explicitly requested that Mr. Jean-Richard inform Ms. Arias that "no assignment will be permitted unless the [fact that the lease will expire in 2007 and will not be extended] is fully disclosed to the assignee, and consented to in writing by the assignee." Pl.'s Ex. 46. Mr. Jean-Richard redacted portions of Dr. Anderson's July letter before providing it to Ms. Arias. Trial Tr. 951, Vol. 6 at pp. 116-17. When asked, "did you give the letter to [Ms. Arias]?" Mr. Jean-Richard testified, "I did not give the whole letter to [Ms. Arias] . . . I did not have any reason [to]. . . ." Trial Tr. 951. The redacted portions of Dr. Anderson's July letter were the parts stating that no lease assignment would occur unless the assignees were informed that the lease extensions would not occur and that the assignees consented to this in writing.

The Court finds that the Jean-Richards knew that the plaintiffs would not purchase Jokers Wild, Inc., unless they received assurances that the lease was going to be assigned and extended for ten years. The Jean-Richards further knew that the lease would not be assigned unless the plaintiffs were informed that Dr. Anderson would not extend the lease under any circumstances. Thus, the Jean-Richards knew what the plaintiffs did not know, the critical ten year lease extension was absolutely not going to happen. And the Jean-Richards sought to keep this crucial information from the plaintiffs so that the sale of Jokers Wild, Inc., would close in August 2004 and the Jean-Richards would get their money.

Even as to Dr. Anderson's requirements which were relayed to Ms. Arias, the Jean-Richards recognized that Ms. Arias, with her limited education and financial acumen, would have difficulty providing the requested financial information and business plan. Consequently, Ms. Jean-Richard assisted Ms. Arias in drafting a business plan and filling out the financial documents. Trial Tr. 577, 579, 2041.

*August 14, 2004*

On August 14, 2006, the parties entered into a Stock Purchase Agreement,[5] (hereinafter SPA). Under the SPA, Ms. Arias paid $200,000 for all shares of Jokers Wild, Inc., $30,000 for the equipment housed at Bistro 123, and $13,500 for the existing inventory at Bistro 123. Pl.'s Ex. 64. Ms. Arias raised a large portion of the $13,500 for the cost of inventory through a $10,000 loan Mr. Ruiz obtained from a friend of his. The remaining $3,500 was "paid after — when the allocations were done," Trial Tr. 486, in the form of a check written to Ms. Jean-Richard. Trial Tr. 487. Therefore, the total purchase Ms. Arias paid for Bistro 123 and its inventory was $243,500.

Ms. Arias tendered the Jean-Richards $100,000 in cash at closing. Pl.'s Ex. 64 and Trial Tr. 482. Ms. Arias raised the $100,000 in cash through the $70,000 line of credit she obtained with Ms. Grandon's assistance and through all of her "family's savings." Trial Tr. 483. (She had already paid the Jean-Richards $30,000 when the parties executed the Letter of Intent). Ms. Arias executed a promissory note to the Jean-Richards for the remaining $100,000. Pl.'s Ex. 64. The plaintiffs' payments on the note from August 2004 until

---

[5] Pl.'s Ex. 64. Although the parties actually executed the SPA on August 14, 2004, according to Ms. Arias, Ms. Jean-Richard reviewed the SPA with her on August 13, 2004. Trial Tr. 490.

March 2005 reduced the overall debt on the note. Ms. Arias did not, however, receive the Jokers Wild, Inc., stock certificates at closing, allegedly due to a misspelling in her name on the certificates. In fact, to this day Ms. Arias still does not possess said stock certificates, despite requests for them. Trial Tr. 504-05. Consequently, the stock did not transfer at closing.

The lease did not transfer at closing either. At closing, Ms. Arias was told that the lease assignment had not yet occurred because Dr. Anderson had not yet approved it. Trial Tr. 490. Ms. Arias testified that the Jean-Richards informed her when she signed the Letter of Intent in July 2004 that the lease assignment was "in the process." Trial Tr. 501. However, Ms. Arias believed the lease assignment was, in effect, a done deal. This belief was based on the representation of Mr. and Ms. Jean-Richard that Dr. Anderson was assigning the lease and that Dr. Anderson simply "hadn't gotten around to signing it [the lease assignment] yet." Trial Tr. 502.

Thus, the Court concludes that Ms. Arias paid over $200,000 for the stock of a company that did not actually transfer at closing and that had one principal asset, the lease, which also did not transfer at closing. Moreover, at closing, the Jean-Richards knew what Ms. Arias did not know, that, because the lease would expire in August 2007, Ms. Arias was buying a restaurant that was soon to lose its ability to operate.

*Post-August 2004*

Ms. Arias took possession of Bistro 123 on August 16, 2004. Trial Tr. 503. From August 16, 2004, until March 30, 2005, Ms. Arias ran and operated Bistro 123, including covering the costs of operating Bistro 123. Trial Tr. 520. At some point in October 2004, Ms. Arias learned what the Jean-Richards already knew, that the lease terminated in August 2007. Trial Tr. 581-82. Ms. Arias objected to this revelation and viewed it as contrary to the agreement that she entered into with the Jean-Richards, who had represented to her that the lease would be extended past 2007 through the two five year extensions referenced in the Jean-Richards' initial lease with Dr. Anderson. Trial Tr. 580-82. Mr. Jean-Richard responded to Ms. Arias' concerns by telling her "not to worry and that everything would work out." *Id.*

*January 2005*

Dr. Anderson finalized the sale of the Bistro 123 building in January 2005 to Mr. Jay Donegan. Trial Tr. 166. The negotiations between Dr. Anderson and Mr. Donegan dated back to 2003. See *supra*. As represented to

the Jean-Richards earlier,[6] Mr. Donegan did not agree to the assignment of the lease or to the two five year lease extensions. Trial Tr. 168-71. Mr. Donegan testified at trial that he contacted the Jean-Richards, "many times in writing and verbally informing them that there would not be any extension of the lease . . . I [also] put in writing and requested that they inform the proposed assignee of that. . . ." Trial Tr. 170.

In January 2005, Ms. Arias became aware of Mr. Donegan's purchase of the building. Ms. Jean-Richard telephoned Ms. Arias to inform her that the lease assignment would not be approved, due to Dr. Anderson's sale of the building to Mr. Donegan. Trial Tr. 515. Subsequently, the Jean-Richards approached Ms. Arias in an attempt to execute the MOA, which would make Ms. Arias the Jean-Richards' employee. The MOA was a surprise to Ms. Arias,[7] and she did not agree to sign it. Trial Tr. 517. Subsequently, Ms. Arias and Mr. Ruiz, through their privately obtained counsel, counteroffered the Jean-Richards' MOA. The Jean-Richards refused to accept the plaintiffs' counteroffer MOA.

*March 30, 2005*

On March 30, 2005, the Jean-Richards prevented Ms. Arias from entering Bistro 123. Ms. Arias arrived at Bistro 123 that morning and was told that she "was not allowed to go into the restaurant." Trial Tr. 528. Almost simultaneously, Ms. Jean-Richard cleared out approximately $12,000 from a joint account owned by Ms. Arias and Ms. Jean-Richard. Trial Tr. 594-95. After the Jean-Richards obtained possession and control of Bistro 123, they either sold or donated practically all of the personal property, inventory, and equipment housed in the restaurant. Trial Tr. Vol. 6 at pp. 45-46.

Subsequently, Ms. Arias initiated the present litigation, filing her first complaint on April 25, 2005.

---

[6] Trial Tr. 170.

[7] Trial Tr. 515. At closing, Ms. Jean-Richard characterized the MOA as a "formality" should the assignment not go through. Trial Tr. 587-88. Furthermore, Ms. Jean-Richard admits that the MOA was not effective or in place at the time of closing in August 2004 and was drafted by the Jean-Richards' attorney in January 2005. Trial Tr. Vol. 6 at p. 33. See also Trial Tr. 1854.

*The Parties' Positions*

*Plaintiffs' Theories of Recovery*

Plaintiffs ground their seven count complaint on the theory that, when Ms. Arias came to defendants to seek assistance in purchasing a restaurant, the defendants were already deep into the process of negotiating the lease of a new restaurant property located in Tyson's Corner. This presented a dilemma for the Jean-Richards because, even after the new restaurant opened, the defendants would still be liable for their obligations associated with their current Vienna, Virginia, restaurant. Plaintiffs contend that defendants realized that they "were still stuck with personal liability against both Raoul and Edna under the Vienna restaurant." Pl.'s Closing Argument (hereinafter Pl.'s Closing) 12. According to plaintiffs, the defendants needed a "vehicle to shed their Vienna obligations so they could concentrate their efforts at the new Tyson's location." *Id.* That "vehicle," according to the plaintiffs, was Ms. Arias and Mr. Ruiz. The plaintiffs contend that they provided the defendants with a means to escape their obligations in Vienna and an ability to make a large amount of money very quickly. Armed with this theory, plaintiffs contend that defendants committed a breach of contract, fraud, a violation of Blue Sky laws, business conspiracy, conversion and trespass to chattels, unjust enrichment and, finally, fraudulent conveyance.

To support their breach of contract claim, plaintiffs argue that the defendants breached the July 16, 2004, Letter of Intent and the SPA executed at closing on August 14, 2004. Specifically, plaintiffs maintain that the defendants never surrendered right, title, and interest in Jokers Wild, nor did the defendants convey to plaintiffs the assets and goodwill of the corporation, nor did the defendants use their "best efforts" to obtain an assignment of the lease as required by the terms of the SPA. Moreover, plaintiffs argue, the defendants did not actually obtain the lease extensions that were contemplated, and the defendants wrongfully evicted plaintiffs from Bistro 123. Pl.'s Closing 8, 9. Further, plaintiffs claim that the defendants' breaching conduct caused plaintiffs to suffer both actual and expectancy losses. Plaintiffs expectancy losses amount to the profits that plaintiffs reasonably believed the restaurant would yield. *Id.* at 10.

As to the fraud claim, plaintiffs assert that the defendants intentionally misrepresented the true nature and status of Bistro 123's lease in an effort to induce plaintiffs to purchase defendants' restaurant. Plaintiffs cite various alleged misrepresentations in support of their position.

In support of their claim of Blue Sky laws violations, plaintiffs assert that the defendants hid material facts from the plaintiffs which were crucial to the transfer of Jokers Wild stock. Pl.'s Closing 19.

Plaintiffs further contend that throughout the entire period between Ms. Arias' first approach to Mr. Jean-Richard and the Jean-Richards' eviction of Ms. Arias from Bistro 123, the Jean-Richards conspired to deceive and injure plaintiffs. Pl.'s Closing 20, 27. In plaintiffs' eyes, this amounts to a business conspiracy.

Concerning plaintiffs' conversion and trespass to chattels claim, plaintiffs reason that when defendants evicted plaintiffs and subsequently took possession of the plaintiffs' property, including, "loot[ing] bank accounts," "seiz[ing] and [selling] [] the inventory and equipment," and "misappropriate[ing] the leasehold," the defendants wrongfully converted plaintiffs' property. Pl.'s Closing 32.

In support of their unjust enrichment claim, plaintiffs state that "it is clear defendants unjustly enriched themselves at plaintiffs' expenses." *Id.*

Finally, concerning plaintiff's fraudulent conveyance claim against defendants, plaintiffs assert that the conveyances of assets to Jean Richard & Associates, L.L.P., was suffused with fraud. According to plaintiff, these conveyances "were made to and do in fact hinder the plaintiffs' attempts to collect upon any potential judgment." Pl.'s Closing 33. Thus, plaintiffs assert that Mr. and Ms. Jean-Richard wrongfully converted plaintiffs' assets and property and then transferred plaintiff's property to Jean Richard & Associates, L.L.P., in an effort to shelter the assets from plaintiffs. Id. at 35-36.

*Defendants' Position: Mr. Jean-Richard, Ms. Jean-Richard, and Jokers Wild, Inc.*

Jokers Wild, Inc., and the Jean-Richards mount a single theme in defense to plaintiffs' seven-count complaint, if Ms. Arias had read and understood the contracts she signed, she would have learned that what she believed transpired between herself and the defendants and what actually occurred between the parties were not one and the same. To put it another way, had Ms. Arias read and understood the documents before she signed them, she would have appreciated the reality of her situation and the nature of the transaction involving Bistro 123. Defendants' Closing Brief (hereinafter Def.'s Closing) 10-12.

Defendants also contend that the discrepancies between what Ms. Arias thought was happening, based on alleged representations made by the Jean-Richards, and the reality contained in the July 2004 Letter of Intent and the

August 2004 SPA, triggered a duty on the part of Ms. Arias to investigate the situation. Defendants question the plaintiffs' judgment in closing on a $230,000 transaction without reading or understanding the paperwork or inquiring into the inconsistencies between what Ms. Arias thought would occur subsequent to the transaction and what the closing agreement said would occur. Def.'s Closing 12. As stated by the defendants: "[Ms. Arias] did not make appropriate inquiry; [Ms. Arias] preferred to believe what [Ms. Arias] wanted to believe." Def.'s Closing 11.

Specifically addressing the breach of contract allegation, defendants maintain that the plaintiffs cannot recover under this claim because the plaintiffs never provided the defendants with the requisite notice of the breach, thereby allowing defendants an ability to cure. Def.'s Closing 32. Furthermore, defendants contend that the plaintiffs have still not articulated or demonstrated the defendants' actual breaching conduct. Def.'s Closing 33. Also, defendants cite deficiencies in plaintiffs' breach of contract claim, including the issue that plaintiffs' alleged damages were not foreseeable, plaintiffs' alleged damages violate the economic loss rule, and plaintiffs' lost profits claim highlights the plaintiffs' failure to mitigate damages. Def.'s Closing 33-34.

In response to the fraud claim, defendants assert that the plaintiffs cannot recover on the fraud count in light of plaintiffs' desire to pursue the breach of contract claim. Defendants also contend that, even if they misrepresented the situation and terms of the agreement, the plaintiffs had a duty to read and understand the contracts. Def.'s Closing 37. Plaintiffs' failure to investigate the discrepancies between what she thought the defendants told her and what was actually contained in the agreements bars plaintiffs' recovery for fraud under *Lloyd v. Smith*, 150 Va. 132 (1928).

Defendants challenge plaintiffs' Blue Sky Laws violation claim by arguing that the transaction at issue was simply the sale of a business by an operator to another operator and not "an instance of the sale of securities promoted by a broker dealer advertised or otherwise publicly promoted to a passive investor." Def.'s Closing 9, 39.

Defendants contest plaintiffs' business conspiracy claim by asserting that, since there is no underlying tort liability for fraud, there is no business conspiracy claim. Def.'s Closing 40. Further, defendants claim the benefit of the intra-corporate immunity doctrine for Mr. and Ms. Jean-Richard. *Id.*

Defendants fault plaintiffs' conversion and trespass to chattels claim as failing to provide evidence of the value of the items claimed to have been converted or trespassed. Def.'s Closing 40. Without more than plaintiffs' mere allegations, the conversion and trespass to chattels claim must fail. The unjust

enrichment claim must also fail because a valid contract existed between the parties. In other words, according to the defendants, the existence of a valid SPA between the parties precludes the plaintiffs from recovering under an unjust enrichment theory. Def.'s Closing 40. Finally, defendants claim that the plaintiffs' fraudulent conveyance claim is "moot by the absence of any claim for which plaintiffs would be a creditor of [Ms. Jean-Richard], Jokers Wild, Inc., or [Mr. Jean-Richard]." Def.'s Closing 40. Moreover, according to defendants, there is "no evidence that [Ms. Jean-Richard] is insolvent." Def.'s Closing 40.

Defendants' counterclaim, filed on May 25, 2005, charges the plaintiffs with one count of breach of contract stemming from the plaintiffs' refusal to sign the MOA, one count of actual fraud, and one count of constructive fraud resulting from plaintiffs' alleged misrepresentations on their financial documentation provided to Dr. Anderson at his request.

*Defendant's Position: Jean-Richard & Associates, L.L.C.*

In simple terms, Jean-Richard & Associates, L.L.C. ("JRA") contends that "this case has never been about JRA." Defendant JRA's Closing Brief (hereinafter JRA Closing) 19. In response to plaintiffs' business conspiracy and fraudulent conveyance actions against them, according to JRA, "JRA did nothing wrong with respect to these plaintiffs and owes them nothing." JRA Closing 2.

As to the business conspiracy claim, JRA maintains that "there is no evidence that JRA participated in any conspiracy to harm the plaintiffs . . . there is no evidence, much less clear and convincing evidence, in this case that JRA combined with anyone to do anything to the plaintiffs." JRA Closing 2. As JRA states, the only evidence presented by the plaintiffs in the business conspiracy charge against JRA is that the Jean-Richard defendants are partial owners of JRA. This does not support the conclusion that JRA is culpable for a business conspiracy merely because some of JRA's owners may or may not have committed tortious conduct towards the plaintiffs and breached an agreement with the plaintiffs. JRA Closing 4-5. In other words, JRA argues that the only thing that plaintiffs have shown is that the Jean-Richards are part owners of JRA. Plaintiffs simply have not shown that JRA conspired with, or agreed with, anyone to harm plaintiffs. *Id.*

Further, argues JRA, there is no evidence that JRA participated in the conduct at issue in this lawsuit. *Id.* at 5-6. Finally, JRA posits that plaintiffs have not shown that the Jean-Richards acted with malice towards the defendants, a necessary showing for a business conspiracy claim. Thus, even if

plaintiffs have demonstrated that JRA conspired with the Jean-Richards to injure the plaintiffs, the plaintiffs have not proven that the Jean-Richards acted with malice. *Id.* at 6. Quite the contrary; according to JRA, the evidence presented at the trial in this matter supports the conclusion that the Jean-Richards wanted the plaintiffs to succeed in their restaurant. The Jean-Richards assisted plaintiffs in operating Bistro 123 for the first two weeks after closing. The Jean-Richards trained the plaintiffs in restaurant operations. At the request of plaintiffs, the Jean-Richards appeared at the plaintiffs' wine dinner to assist plaintiffs. Finally, the Jean-Richards brought their friends to Bistro 123 after the plaintiffs were already operating the restaurant. *Id.* 6-8.

Concerning the fraudulent conveyance claim against JRA, JRA asserts that plaintiffs have not shown fraud or fraudulent intent associated with the asset transfers from defendant Ms. Jean-Richard to JRA. JRA claims that "it was undisputed that the funds transferred to JRA from [Ms. Jean-Richard] were used to purchase and obtain valuable consideration (i.e. membership interest in JRA)." *Id.* Without such a showing of fraud or fraudulent intent, plaintiffs' fraudulent conveyance claim against JRA must fail. JRA Closing 10. Further, JRA contends that the appropriate remedy for a fraudulent conveyance, assuming *arguendo* that such a fraudulent conveyance did occur, is to set aside the transfer, not to award damages. *Id.*

### Legal Discussion and Analysis

### A. *Breach of Contract*

In Virginia, the required elements of a breach of contract claim are as follows: (1) a legally enforceable obligation of defendant to plaintiff, (2) defendant's violation or breach of obligation, and (3) injury or damage to plaintiff caused by the defendant's breach. See, i.e., *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (2007). Further, in order to be an enforceable agreement, the agreement must have been validly accepted by both parties and supported by consideration. See, i.e., *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346 (1980). To recover, plaintiffs must prove the aforementioned elements by a preponderance of evidence. See, i.e., *Carley Capital Group v. City of Newport News*, 709 F. Supp. 1387 (E.D. Va. 1989).

The Court finds that the defendants breached the SPA in two primary ways: (1) the defendants did not use their "best efforts" to obtain the lease assignment from Dr. Anderson, and (2) the defendants did not transfer the stock in Jokers Wild, Inc., to the plaintiffs.

In July 2004, the parties had a legally enforceable agreement, the Letter of Intent. The August 14, 2004, SPA supplanted the Letter of Intent. The SPA imposed on the Jean-Richards and Jokers Wild, Inc., the significant obligation of using their "best efforts to obtain an assignment of the lease. . . ." Pl.'s Ex. 64, 2. Although the SPA states that the Jean-Richards "make[] no representation that an assignment can be obtained from the current landlord," id., this provision does not negate the Jean-Richards' obligation to use their best efforts to obtain a lease assignment.

Furthermore, even though Mr. Jean-Richard did not actually sign the SPA, he is liable for the breach of contract because he acted as both Ms. Jean-Richard's and Jokers Wild, Inc.'s agent when negotiating with Ms. Arias. Virginia imposes two requirements on relationships between parties before the relationship can be characterized as an agency relationship. First, the agent must be subject to the principle's control. Second, the work done by the agent must benefit the principle. See, i.e., *Schkeut v. Warren*, 693 F. Supp. 416 (E.D. Va. 1988). Further, once an agency relationship is established, a duly authorized agent acting on behalf of his principle is not personally responsible on a contract entered into on behalf of the principle, when the third party executing the contract knows that the agent acts for the principle only. See, i.e., *Lambert v. Phillips & Son*, 109 Va. 632 (1909). In this case, according to Ms. Jean-Richard, Mr. Jean-Richard was repeatedly listed as the owner of Jokers Wild, Inc., in various documents and to Ms. Arias. Trial Tr. Vol. 6 at p. 30. Furthermore, at his own instigation, Mr. Jean-Richard acted as the liaison between Dr. Anderson and Ms. Arias. Accordingly, the Court finds Mr. Jean-Richard liable on the plaintiffs' breach of contract claim through agency liability because it is clear that Ms. Arias did not know that Mr. Jean-Richard was not an owner of Jokers Wild, Inc., at the time the parties executed the SPA. This finding also resolves the defendants' motion to strike.

Despite their duty under the SPA, the Jean-Richards did not use their best efforts to try to obtain a lease assignment. According to Dr. Anderson's testimony, "I stated to Mr. Jean-Richard that I would be happy to assign the lease to Ms. Arias if I could talk with her and explain to her that the lease would not pass 2007." Tr. 104. However, Mr. Jean-Richard discouraged Dr. Anderson from communicating with Ms. Arias, contrary to Dr. Anderson's requests. Furthermore, Dr. Anderson relayed his position in a letter he sent to Mr. Jean-Richard which expressly requested that Mr. Jean-Richard relay Dr. Anderson's position on the lease assignment to the prospective assignees. Mr. Jean-Richard not only did not relay Dr. Anderson's warning regarding the lease assignment to Ms. Arias, but actually altered Dr. Anderson's letter

before sending it to Ms. Arias in such a way as to string Ms. Arias along in believing that Dr. Anderson intended to assign the lease and that the lease would be extended for ten years past its expiration in August 2007.

The Court finds that this conduct by the Jean-Richards amounts to a breach of the SPA. Plainly, the Jean-Richards were supposed to exercise due diligence, at a minimum, to obtain the lease assignment. The Jean-Richards did not. Concerning the final element, the Court finds that the plaintiffs suffered damages as a result of the Jean-Richards' breach, namely, the lease assignment did not occur which destroyed the plaintiffs' ability to own and operate Bistro 123. For these reasons, the Court finds the Jean-Richards and Jokers Wild, Inc., liable for their breach of contract.

The SPA also required that the Jean-Richards transfer all of the stock in Jokers Wild, Inc., to plaintiffs by August 26, 2004. Pl.'s Ex. 64, 1. According to trial testimony, the stock never transferred, which this Court finds to be a further breach of contract. The damages resulting from this breach are obvious; Ms. Arias and Mr. Ruiz never obtained ownership of Jokers Wild, Inc.

## B. *Fraud*

Litigants claiming fraud must show the following: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with the intent to mislead, (5) reliance by the misled party, and (6) damage to the misled party. See, i.e., *State Farm Auto Ins. Co. v. Remley*, 270 Va. 209, 218 (2005). Additionally, "concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp. v. Holbert*, 227 Va. 441, 450 (1984) (citations omitted). Fraud claims must be pleaded with specificity. See, i.e., *Mortarino v. Consultant Engineering Sys., Inc.*, 251 Va. 289, 295 (1996).

This Court finds that the Jean-Richards defrauded Ms. Arias and Mr. Ruiz by leading them to believe that the lease would be assigned and that the lease would be extended ten years from its expiration in 2007. The most blatant instance of fraudulent conduct on the part of the Jean-Richards concerns Dr. Anderson's July letter. Mr. Jean-Richard materially altered Dr. Anderson's July letter before transmitting it to Ms. Arias, and he did so to conceal from the putative purchasers the critical fact that the lease would not be extended. At the same time, the altered letter conveyed to Ms. Arias and Mr. Ruiz the false and misleading impression that Dr. Anderson had only imposed two requirements for the lease assignment, i.e., the provision of a business plan and financial documentation, when in fact, Dr. Anderson had a

third requirement, i.e., that Ms. Arias be advised that the lease would not be extended. Ms. Arias testified convincingly that she would not have purchased Bistro 123 for $230,000 knowing that the lease would only last three years and expire in 2007. In other words, Ms. Arias relied on the misrepresentations and omissions. This plainly amounts to fraud.

Although this one instance of fraud would support plaintiffs' fraud claim, this is not the only misrepresentation at the hands of the Jean-Richards. The Court finds that, from the moment the Jean-Richards proposed that Ms. Arias purchase their restaurant, the Jean-Richards deliberately and intentionally mislead Ms. Arias and Mr. Ruiz about a matter that went to the very heart of the transaction, the fact that this restaurant could not succeed because it had a lease which would expire in three years.

Ms. Arias trusted the Jean-Richards based on what she believed to be a true friendship and mentoring relationship between Ms. Arias and Mr. Jean-Richard. The Jean-Richards betrayed that trust. Had this been a traditional arms length transaction between two sophisticated business persons, perhaps the Jean-Richards would not have gotten away with their efforts to pull the wool over the eyes of the purchasers. But these purchasers were anything but sophisticated, as was amply demonstrated by their willingness to accept what the Jean-Richards were telling them, by their acceding to the Jean-Richards' suggestion that they use the Jean-Richards' attorney for the closing instead of hiring their own attorney who would provide them independent advice and counsel, and by not insisting on the stock certificates being transferred, pursuant to the SPA.

For the aforementioned reasons, the Court finds the Jean-Richards and Jokers Wild, Inc., liable for fraud.

## C. *Blue Sky Laws Violation; The Virginia Securities Act*

The purpose of the Virginia Securities Act, codified in Va. Code § 13.1-501, *et seq.* (2007), colloquially known as the "Blue Sky Act," is to suppress the sale of stock with little or no value,[8] to allow a buyer of securities to recover damages for any sale of securities in violation of the statute,[9] and generally to govern those who sell securities within the Commonwealth. See, i.e., *Lintz v. Carey Manor, Ltd.*, 613 F. Supp. 543 (E.D. Va. 1985).

---

[8] See, e.g., Stevens v. Abbott, Proctor & Paine, 288 F. Supp. 836 (E.D. Va. 1968).

[9] See, e.g., Merchant v. Oppenheimer & Co., 568 F. Supp. 639 (E.D. Va. 1983), rev'd on other grounds, 739 F.2d 165 (4th Cir. 1984).

Under Va. Code § 13.1-522(A), a claimant may recover from any person who sells securities in violation of the Blue Sky Laws or who sells a security via "an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made in light of the circumstances under which they were made, not misleading." The statute further states that the person selling the security with fraudulent representations "shall be liable to the person purchasing such security . . . either at law or in equity. . . . [The purchaser can] recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorney's fees. Va. Code § 13.1-522(A).

Va. Code § 13.1-522(B) imposes liability on "any person who engages in the business of advising others, for compensation . . . as to the value of the securities or as to the advisability of investing in, purchasing, or selling securities in willful and material violation of [the Blue Sky Laws]." Therefore, § 13.1-522(A) imposes liability for misrepresentations which induce buyers to purchase securities, and § 13.1-522(B) imposes liability for improper advice regarding the purchase or sale of securities.

In this case, the plaintiffs allege that the Jean-Richards violated both § 13.1-522(A) and § 13.1-522(B). Specifically relating to § 13.1-522(A) allegations, the plaintiffs contend that the Jean-Richards misrepresented to the plaintiffs the status of the lease for Bistro 123 to induce the plaintiffs to purchase all of the stock in Jokers Wild, Inc. Amend. Compl. 19-20. Relating to the purported § 13.1-522(B) violation, the plaintiffs claim that the Jean-Richards violated this provision of the Securities Act when the Jean-Richards advised the plaintiffs to purchase the Jokers Wild, Inc., stock in violation of the Securities Act. Thus, the plaintiffs fault the Jean-Richards, first, for misrepresenting during negotiations between the parties the status of the lease and, second, for advising the plaintiffs to purchase the Jokers Wild, Inc., stock.

### 1. Va. Code § 13.1-522(A)

Under *Diaz Vincente v. Obenauer*, 736 F. Supp. 679 (E.D. Va. 1990), the mere uttering of a fraudulent misstatement or omission concerning the sale of securities is enough to impose liability under § 13.1-522(A). Further, under *Atocha, Ltd. P'ship v. Witness Tree, L.L.C.*, 65 Va. Cir. 213 (2004), "only the actual seller, [], [can] be held liable to the investors for false and misleading statements made or omitted." Accordingly, the precise inquiries are: (1) did the defendants actually conduct the sale of the Jokers Wild, Inc., stock to the plaintiffs, and (2) did the Jean-Richards make material misrepresentations to

the plaintiffs concerning the sale of the Jokers Wild, Inc., stock? The Court answers "yes" to both questions. The same fraudulent conduct that gives rise to this Court's finding of fraud, establishes the Blue Sky Law violation. Consequently, the Court finds that the Jean-Richards violated Va. Code § 13.1-522(A) and thus are liable to the plaintiffs for the consideration paid by the plaintiffs for the Jokers, Wild, Inc., stock, for interest on such consideration, for costs, and for reasonable attorney's fees, as provided by the statute.

### 2. *Va. Code § 13.1-522(B)*

Va. Code § 13.1-522(B) states that "any person who engages in the business of advising others, for compensation, [] as to the value of securities . . . shall be liable." Here, it is clear that the Jean-Richards advised the plaintiffs to purchase all of the stock in the Jean-Richards' company. However, in the Court's opinion, this does not amount to a § 13.1-522(B) violation. The statute appears to be directed at persons in the business of advising others as to the value of securities. The Jean-Richards do not appear to fall into this category, at least not in this transaction's context. Therefore, the Court does not find that the defendants violated § 13.1-522(B).

## D. *Business Conspiracy*

Virginia codified its business conspiracy statute in Va. Code § 18.2-499 *et seq.* (2007). Va. Code § 18.2-499 states, "any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business, or profession by any means whatever. . . ." shall be liable for conspiracy. Thus, the elements of a business conspiracy claim in Virginia are the following: (1) concerted action; (2) legal malice; and (3) causally-related injury. See, i.e., *Virginia Vermiculite, Ltd. v. W. R. Grace & Co. - Conn.*, 144 F. Supp. 2d 558 (W.D. Va. 2001), aff'd *sub nom. Virginia Vermiculate, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277 (4th Cir. 2002).

According to the plaintiffs, "Edna Jean-Richard, [] Raoul Jean-Richard, [] Jokers Wild, Inc., and [] Jean-Richard and Associates, L.L.C., did conspire and seek to interfere with the trade, business, and profession of the [p]laintiffs." Amend. Compl. ¶ 125. Further, plaintiffs complain that "as a result of the defendants' identity as separate legal persons, the two entities, [d]efendant Jean-Richard & Associates, L.L.C., and [d]efendant Jokers Wild, Inc., could and did combine, associate, agree, mutually undertake, and/or act

in concert together for the purpose of willfully and maliciously injuring [] the plaintiffs." Amend. Compl. ¶ 128. Thus, the plaintiffs contend that the Jean-Richards conspired with each other, Jokers Wild, Inc., and JRA. The Court finds that there was no business conspiracy and that this claim fails as to all defendants.

First, as to JRA, there is no credible evidence that it conspired with anyone. Second, as to an alleged conspiracy between Jokers Wild, Inc., and its principals, the intra-corporate immunity doctrine defeats a claim of conspiracy. When a plaintiff claims that a corporation and one of its employees conspires to injure the plaintiff, no conspiracy exists "because a corporation is a legal fiction capable of acting only through its officers and employees and is considered to be essentially only one officer." *Sunsport, Inc. v. Barclay Leisure, Ltd.*, 984 F. Supp. 418 (E.D. Va. 1997). Third, as to the conspiracy claim solely involving Mr. and Ms. Jean-Richard, the claim of business conspiracy fails here as well. While there was concerted action and certainly fraud, this Court cannot find that the Jean-Richards' misconduct was "for the purpose of . . . injuring another in his . . . business. . . ." The purpose of the defendants' misconduct was to induce the plaintiffs to purchase a business based on false and fraudulent representations regarding the nature of that business. It was not to injure them in the operation of that business. Thus, the Court finds for each defendant on the business conspiracy claim.

## E. *Conversion and Trespass to Chattels*

The Virginia Supreme Court defines the tort of conversion as, "any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994), and *Quadriga Art, Inc. v. Law Enforcement Alliance of Am.*, 70 Va. Cir. 99 (2005). Furthermore, as the Virginia Supreme Court states,

In general, a cause of action for conversion applies only to tangible property. However, many courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond. A cause of action for conversion does not encompass claims for interference with undocumented intangible property rights.

*United Leasing Corp.*, 247 Va. at 305.

The tort of trespass to chattels is defined in Virginia as the intentional use or intermeddling with the personal property of another without authorization from the property's owner. *America Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444 (E.D. Va. 1998).

The plaintiffs maintain that Mr. and Ms. Jean-Richard committed conversion and trespass to plaintiffs' chattels on March 30, 2005, when the Jean-Richards "wrongfully exercised dominion and control over the stock of Jokers Wild, Inc.," when the Jean-Richards seized the personal property that plaintiffs purchased from the Jean-Richards, including the inventory and equipment of Bistro 123, and when Ms. Jean-Richard withdrew the existing balance in the plaintiffs' bank account. Amend. Compl. ¶¶ 193-98.

The Court concludes that on March 30, 2005, at the same time the plaintiffs were ejected from Bistro 123 at the Jean-Richards' request, the Jean-Richards seized all of Bistro 123's inventory and equipment, property which the defendants sold the plaintiffs almost six months before for the purchase price of $13,500. The Jean-Richards then either sold or donated practically all of the plaintiffs' personal property. Trial Tr. Vol. 6 at p. 45-46. Therefore, the Court finds that Mr. and Ms. Jean-Richard wrongfully converted the plaintiffs' personal property located in Bistro 123 on March 30, 2005. Consequently, the Court finds Mr. and Ms. Jean-Richard liable to the plaintiffs for this conversion. However, the Court does not find conversion in connection with Ms. Jean-Richards' withdrawal of the $12,000. First, there was uncontroverted testimony at the trial that the account was jointly owned by Ms. Arias and Ms. Jean-Richard. Second, money cannot be the subject of conversion, only tangible personal property may be converted. See, i.e., *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994). As to the count claiming trespass to chattels, the Court believes that the tort of conversion better captures the Jean-Richards' misconduct and, thus, does not find in the plaintiffs' favor as to the trespass to chattels claim.

F. *Unjust Enrichment*

Unjust enrichment claims arise from the recognized Virginia principle that "one person may not enrich himself unjustly at the expense of another." See, i.e., *Kern v. Freed Co.*, 224 Va. 678 (1983). Thus, unjust enrichment claims lie in equity and stem from an implied contract or an otherwise unenforceable contract. However, where there is a legally enforceable, valid and express contract between the parties, the "law will not imply a contract in

contravention thereof." See, i.e., *Ellis & Myers Lumber Co. v. Hubbard*, 123 Va. 481 (1918), and *Royer v. Board of County Supervisors*, 176 Va. 268 (1940).

In the instant case, the Court previously found that a valid contract existed between the parties and thus governed their actions. Further, the Court found in its discussion above that the defendants breached their agreement with the plaintiffs. As a result of the Court's findings and conclusions above, the Court does not find for the plaintiffs on their unjust enrichment claim.

## G. *Fraudulent Conveyances*

A fraudulent conveyance can be defined as a conveyance or transfer of property, the object of which is to defraud a creditor, or hinder or delay him, or to put such property beyond the reach of a creditor. See, generally, *Black's Law Dictionary* (5th ed. 1979). Further, a conveyance is considered fraudulent *in law* when it has been executed under such circumstances that the law itself conclusively infers the fraudulent intent from the intrinsic nature of the circumstances without an inquiry into the actual intent of the parties to the transaction. Alternatively, a conveyance is fraudulent *in fact* if the circumstances surrounding the conveyance are not such that the law conclusively infers a fraudulent intent from them, but where the parties have actually intended to delay, hinder, or defraud the creditors or purchasers. Both conveyances are equally void. See, i.e., *Land v. Jeffries*, 26 Va. (5 Rand.) 211 (1827).

The plaintiffs claim that Mr. and Ms. Jean-Richard created JRA with the money that they received from the plaintiffs for the purchase of Jokers Wild, Inc., stock and with the improper intent to defraud and hinder their creditors, including the plaintiffs, from recovering damages from the defendants. Amend. Compl. ¶¶ 202-13. The Court does not accept the plaintiffs' theory. Of particular importance to this issue is the fact that Mr. and Ms. Jean-Richard are not the only owners of JRA. Further, as JRA claims in their closing brief, the plaintiffs did not present credible evidence of a fraudulent intent behind the transfers of money from the Jean-Richards to JRA. Under *Colonial Inv. Co. v. Cherrydale Cement Block Co.*, 194 Va. 454, 459 (1952), "clear, cogent, and convincing" evidence must support fraudulent conveyance claims. At best, the plaintiffs have shown that Ms. Jean-Richard

used the proceeds from the sale of Jokers Wild, Inc., to buy into JRA,[10] and not that Ms. Jean-Richard transferred money to JRA with the purpose of hindering or delaying her creditors' access to her assets. This does not warrant a finding of fraudulent conveyance.

In summary, the Court finds for the plaintiffs on the breach of contract claim (Count I), the fraud claim (Count II), the Virginia Security Act violation claim (Count III), and the conversion claim (Count IV). Additionally, the Court does not find Jean-Richard & Associates, L.L.C., liable to the plaintiffs for business conspiracy or fraudulent conveyances.

## Damages Recoverable by Plaintiffs

### A. Breach of Contract

Damages for breaches of contract are limited by the economic loss rule[11] and further limited to those damages which "fairly, reasonably, and naturally arise in the ordinary course of things from such a breach." *Id.*

Thus, this Court awards plaintiffs compensatory damages in the amount of $165,186.[12] This amount equates to the damages the plaintiffs sustained as a result of the defendants' breach of contract. The Court concludes, however, that the plaintiffs are not entitled to expectancy losses relating to the profits that the plaintiffs projected to earn while operating the restaurant. The Court finds that the expectancy damages requested by the plaintiffs are too

---

[10] See, e.g., Trial Tr. Vol. 6 at p. 18 (showing that Ms. Jean-Richard testified that she took the proceeds she received in the sale of Jokers Wild, Inc., to the plaintiffs and used it to buy into JRA).

[11] The principle behind the economic loss rule is the concept that "contract damages be limited to those within the contemplation and control of the parties in framing their agreement." *City of Richmond v. Madison Mgt. Group*, 918 F.2d 438 (4th Cir. 1990).

[12] This amount equals the $143,500 purchase price the plaintiffs paid for Jokers Wild, Inc., plus the $21,686 the plaintiffs paid on the promissory note to the defendants. The Court notes, however, that the plaintiffs cite in their closing argument two different sums for the amount that they have repaid on the promissory note given to the defendants. Pl.'s Closing 10, 17. The Court used the higher figure to calculate the overall damage award to the plaintiffs. If either party believes that Ms. Arias and Mr. Ruiz paid more or less that $21,686 on the $100,000 note, they may bring it to the Court's attention at the attorney's fees hearing.

speculative and uncertain and, therefore, cannot form the basis of a damage award in this case. Cf., *Boggs v. Duncan*, 202 Va. 877 (1961) (stating that, "[i]t is well settled that damages are recoverable for loss of profits prevented by a breach of contract only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. Moreover, profits which are remote, speculative, contingent, or uncertain are not recoverable"). Finally, the Court awards the plaintiffs the costs and attorney's fees associated with pursuing the instant litigation since, under the SPA between the parties, "the prevailing [p]arty in any litigation to construe or enforce the terms of this Agreement shall be entitled to the costs of that litigation, including reasonable attorney's fees." Pl.'s Ex. 64, 10. The Court reserves for a subsequent hearing the determination of the specific amount of attorney's fees to which the plaintiffs are entitled under the SPA.

## B. *Fraud*

Similar to recovery for breach of contract claims, Virginia courts primarily award only compensatory damages for fraud claims, because "Virginia does not permit recovery of punitive damages except upon proof of a degree of aggravation in the critical state of mind above the threshold level required to establish liability for compensatory relief." *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921 (4th Cir. 1984). That is not to say, however, that Virginia litigants may not recover punitive damages for fraud claims. See, i.e., *Wilkins v. Peninsula Motor Cars*, 59 Va. Cir. 329 (2002). Rather, punitive damages stemming from fraudulent activity are permitted upon a showing of willful, wanton, and reckless material misrepresentations or omissions of material facts. *Hamilton Dev. Co. v. Broad Rock Club*, 248 Va. 40 (1994) (citing *Giant of Virginia, Inc. v. Pigg*, 207 Va. 679, 685 (1967)).

## C. *Compensatory Damages*

The Court finds that a majority of the damages that the plaintiffs request relating to their fraud claim against the defendants are also requested in plaintiffs' breach of contract claim. But for the plaintiffs' recovery of $165,186 for the defendants' breach of contract, the Court would award plaintiffs $165,186 in compensatory damages for the plaintiffs' fraud claim. However, for the Court to award plaintiffs $165,186 for the breach of contract claim *and* the fraud claim would constitute double-recovery. Therefore, to avoid duplicative recovery, the Court will permit the plaintiffs to recover those damages only once. The Virginia Supreme Court states, "[i]n determining

whether multiple damage awards constitute impermissible double recovery, the trial court must consider the nature of the claims involved, the duties imposed, and the injury sustained." *Advanced Marine Enter. v. PRC Inc.*, 256 Va. 106, 124 (1998).

The Court does find, however, that the plaintiffs are entitled to the following additional relief to compensate them for the defendants' fraudulent conduct: $5,000 paid to the attorney the parties used during their August 2004 closing.

## D. *Punitive Damages*

The United States Supreme Court distinguished compensatory damages from punitive damages in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). According to the Court:

> compensatory and punitive damages, although usually awarded at the same time by the same decision maker, serve different purposes. Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution.

*Id.* Additionally, the Court states that:

> that there are procedural and substantive constitutional limitations on these awards; [t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. . . . elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a state may impose. To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property.

*Id.*

Thus, punitive damages awards are acceptable when they are not grossly excessive or arbitrary. Further, as stated by Judge Klein of this Court, "in determining an award of punitive damages, as long as discretion is

exercised with reasonable constraints, due process is satisfied." *Markowitz v. Re/Max Preferred Props.*, 42 Va. Cir. 292 (1997). No fixed standard exists for measuring punitive damages and the amount awarded is within the fact finder's discretion. *Hamilton Devel. Co. v. Broad Rock Club, Inc.*, 248 Va. 40 (1994). See also *Baldwin v. McConnell*, 273 Va. 650, 2007 Va. LEXIS 60 (2007).

When considering the actual punitive damages amount, the fact finder may consider the tortfeasor's financial condition. *Id.* In the case at hand, the defendants' declared annual income is approximately $179,000. Pl.'s Closing 17. The defendants invested in JRA approximately $650,000. *Id.* Ms. Jean-Richards' net worth is approximately $500,000. Trial Tr. 1479 (showing that Ms. Jean-Richard testified that her personal net worth, not including assets jointly owned with Mr. Jean-Richard or her interest in JRA or the Jean-Richards' Tyson's Corner restaurant, amounts to "probably half a million"). The Jean-Richards have various other profitable investments, including, of course, their co-ownership of the new Tyson's Corner Bistro 123. Pl.'s Ex. 99, 132A, 133A, 134.

Additionally, courts contemplating punitive damage awards should consider:

> the grievousness of the acts, the degree of malicious intent, whether the award bears a reasonable relationship to the award of compensatory damages, the potential damage that might have been caused by the acts, the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct, and the wealth of the wrongdoer. . . . [and] the reasonableness of punitive damages on a case-by-case basis, considering the relevant circumstances in each particular case.

*Baldwin v. McConnell*, 273 Va. 650, 658, 2007 Va. LEXIS 60 (2007) (quoting *Management Computer Servs. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 82 (Wis. 1996)).

Finally, punitive damages will not be reversed on appeal unless the size of the punitive damage award "shocks the conscience of the [appellate] court and creates the impression that the [fact finder] was biased in favor of the plaintiff or prejudiced against the defendant . . . or if the award is so out of proportion to the plaintiff's damages as to suggest that it is not the product of a fair and impartial decision." *Hamilton Dev. Co. v. Broad Rock Club*, 248 Va. 40 (1994) (citations omitted).

The Court finds that the misconduct at issue in the instant case goes substantially beyond a "garden variety" fraud. First, based on the record before this Court, the amount of money at issue, $243,500, was, for Ms. Arias and Mr. Ruiz, every bit of money that they had available or that they could obtain or borrow from family and others. The Jean-Richards knew that the stakes for Ms. Arias and Mr. Ruiz could hardly have been greater, yet they did not hesitate to take advantage of them at virtually every opportunity. Second, stripped of all gloss, the Jean-Richards essentially swindled Ms. Arias and Mr. Ruiz out of their money. They employed calculated deception and materially omitted important information from the plaintiffs in order to take advantage of Ms. Arias and Mr. Ruiz's lack of sophistication and to take more than $150,000 in cash from them with their commitment to pay even more. The Jean-Richards led Ms. Arias and Mr. Ruiz to believe that they were purchasing a restaurant, when in fact and in truth, all that the plaintiffs purchased for $243,500 was the "privilege" of becoming the Jean-Richards' employees.

The Jean-Richards' conduct was grievous and severe. To put it simply, the record in this case shows that from the moment that Ms. Arias approached Mr. Jean-Richard seeking his advice in purchasing a restaurant, the Jean-Richards preyed on Ms. Arias' trust and ignorance of business operations. They suggested that she purchase their restaurant. They recommended Ms. Grandon when Ms. Arias needed additional funds to purchase the restaurant. They drafted the business plan for her restaurant and filled out her financial documentation to satisfy Dr. Anderson's requirements. And most importantly, from the beginning of their interactions with the plaintiffs, the Jean-Richards intentionally concealed the fact that the restaurant could only operate until August 2007. This constitutes both grievous and malicious conduct.

Moreover, the actual damages sustained by the plaintiffs were immense. The plaintiffs essentially were tricked into turning over to the Jean-Richards their life savings and the savings of family members.

Finally, the Court has also considered the total compensatory damage award to the plaintiffs amounting to $183,686. This amount equals the Court's award of $165,186 to compensate plaintiffs for the purchase price of Jokers Wild, Inc., $5,000 plaintiffs paid in attorney's fees associated with the SPA, and $13,500 for the defendants' conversion of plaintiffs' personal property located in the restaurant when defendants prevented plaintiffs from entering it in March 2005. As well, the Court has considered the defendants' current financial position as further described above. See *supra*. With all these factors taken into consideration, the Court concludes that a punitive damage award of $75,000 is appropriate in the instant case and bears a reasonable relationship to the plaintiffs' compensatory damage award.

Thus, the Court awards plaintiffs punitive damages for their fraud claim in the amount of $75,000.

## E. *Blue Sky Laws Violation*

The Virginia Security Act unequivocally provides for an award of interest, costs, and reasonable attorneys' fees. Va. Code § 13.1-522(A) (2007). Therefore, the Court finds that the plaintiffs may recover interest, costs, and attorney's fees[13] for the defendants' Blue Sky Laws violation. The Court has already provided the plaintiffs relief for the other damages sought by the plaintiffs pertaining to their Blue Sky Laws claim. Again, to avoid double recovery, the Court will permit the plaintiffs to recover these damages only once.

## F. *Conversion*

Since the Court concludes that the defendants wrongfully converted the plaintiffs' personal property when the defendants seized the inventory located in Bistro 123 when the defendants evicted the plaintiffs from the restaurant, the Court finds that the plaintiffs are entitled to recovery in the amount of the personal property, specifically, $13,500.

## G. *Defendants' Counterclaim*

The Court does not find the plaintiffs liable to the defendants on the defendants' counterclaim. Specifically, the Court concludes that the plaintiffs did not breach an agreement with the defendants when Ms. Arias refused to execute the MOA the Jean-Richards brought her in January 2005. According to Ms. Jean-Richard, that MOA was not in existence in August 2004 when the SPA was executed. Ms. Jean-Richard testified that the MOA was drafted in January 2005. Trial Tr. Vol. 6 at p. 33. Ms. Arias' action in refusing to sign the MOA cannot amount to a breach of contract since she never actually consented to sign the specific document in question. Although the SPA references an agreement between the parties to enter into an MOA should the lease assignment not occur, the Court does not find this agreement to constitute a binding commitment because the specific MOA brought to Ms.

---

[13] The Court notes, however, that the plaintiffs are also entitled to recover attorney's fees under the terms of the SPA.

Arias in January 2005 did not actually exist at the time the parties executed the SPA in August 2004. Moreover, it is clear to this Court that, long before the plaintiffs are alleged to have breached the SPA by not executing the MOA, the defendants committed the first breaches of contract. Finally, as to the defendants' claims of fraud against the plaintiffs, the Court does not find that the plaintiffs committed either actual or constructive fraud against the defendants.

## *Conclusion*

The Court awards the plaintiffs $183,686 in compensatory damages resulting from the defendants' breach of contract, fraudulent mis-representations, Blue Sky Laws violation, and conversion of the plaintiffs' personal property, and $75,000 in punitive damages stemming from the defendants' fraudulent misrepresentations. Consequently, the total damage award to the plaintiffs is $258,686.

The costs, interest, and attorney's fees award to plaintiffs will be determined in a future hearing before the Court. Therefore, the Court maintains jurisdiction over this matter and this Letter Opinion does not constitute a final order.